Good morning and welcome to the Ninth Circuit. Very glad to be joined by my colleagues, Judge Forrest and Judge Sun. We'd also like to welcome counsel who will be arguing. I think we've got most everyone in the courthouse. We've got one counsel who will be arguing briefly by video. We'd ask that during arguments you just keep to your allocated time frames, watch your time, and try to sum up as time's concluding. Let us know if you want time for rebuttal. We've really got two cases set for argument this morning. The first is a consolidated case, the Alliance for the Wild Rockies v. United States Forest Service. And that case has been set for 20 minutes. If we go longer, we're not going to lose a lot of sleep over this one. This is a tough case, but we'll go ahead and welcome, I don't know, government. Yeah. May it please the court, my name is Joan Pepin on behalf of the Forest Service. These appeals are both about a project to reduce the risk of catastrophic wildfire near three communities in northern Idaho that are surrounded by national forest lands that have already been identified as suffering from declining health due to insect and disease infestations. In 2014, Congress amended the Healthy Forest Restoration Act to create a categorical exclusion from NEPA for exactly this kind of project. As this court explained in Center for Biological Diversity v. Alano, the purpose of that statutory amendment was to give the Forest Service flexibility to combat these infestations quickly and to, quote, expedite the response. Council, sorry to interrupt you, but I just want to touch the chase on one of my questions. In your opening brief in Hanna Flats 1, you state that the court's initial premise, I think referring to the district court, is undisputed that the area identified in community wildfire protection plan as a wild land urban interface must by statutory definition be within or adjacent to an at risk community. Are you conceding that if a community plan identified a wild land urban interface that is not within or adjacent to an at risk community, if that term is defined in the statute, then the wild land urban interface would not comply with HFRA? Yes. And so then my question is, if a community plan had a noncompliant wild land urban interface identified in it, is your position that the service could still rely on that? No. It's sort of, I guess, it's a matter of opinion about whether it complies, right? If the Forest Service opinion is that it does comply, then the Forest Service can rely on that. If the Forest Service's opinion is that it does not comply, then the Forest Service would not rely on that. And it's not required to implement projects in the wild land urban interface just because the county has designated it. It still has discretion. So you're saying the service at some point then does have to make its own assessment about whether the community plan's wild land urban interface complies with the statute? Well, the Forest Service is a consulting party in the creation of the plan in the first place. So if there was a problem with it, they would already be aware and probably would not plan any projects inside that. They would, first of all, I think, voice their concerns. If they felt that the county was going overboard and designating way too much area that is not, in fact, within danger distance of a community, not where fire could travel rapidly or where homes and watersheds are at risk and health effects. If they felt that this was not correctly identified as wild land urban interface, I think they would contribute that viewpoint in the creation of the plan in the first place. Part of the concern I have is that the Forest Service seems to be saying, just trust us. Like, we will get this right behind the scenes. And then once it's in the community plan, all we have to do is say this is in the community plan and the story. Am I misunderstanding the position? Well, they don't have a procedural duty to independently recreate the county's analysis. But it is still subject to judicial review. It's just that it would be a substantive challenge. But if we're reviewing it for arbitrary capriciousness, which you seem to be arguing, I was a little bit confused by that because I thought maybe your argument was this was a legal determination. And so the question was whether this was contrary to law. But that's not the argument you seem to be making. You say this is reviewed for arbitrary and capriciousness under the APA. Well, but that includes errors of law, of course. But, yes, the arbitrary and capriciousness is the correct standard as this court has consistently implied. Well, is it arbitrary and capricious or is it contrary to law? I mean, those are two separate standards under the APA, one for legal review, one for factual review. I thought the contrary law was part of what can make a decision arbitrary and capricious. But the standard is the arbitrary and capricious standard. So then let me ask it this way. Do you think this is a factual determination or is this a legal determination? The question that the district court decided is that there is a procedural duty for the Forest Service to independently identify the wildland urban interface. That's a legal question. Well, with respect to the counsel, I don't quite read the district court's opinion that way. I think the district court said under the APA, you know, when the service makes a decision or any agency makes a decision, there's an obligation to explain its reasoning. Right, and it did. On page 344 of the Volume 3, page 344, the Forest Service said that it was applying the wildland urban interface in the Bonner County Plan. I think that's the concern is that you sort of, I don't know why the Forest Service is sticking to this argument so strongly. And I really want to understand why, because you brought it up again in the second case. And it just seems counterintuitive that the response is, hey, it's part of the community plan. That's all we need to say. Why don't you have to explain whether the community plan goes further than the statute or less than the statute? First of all, if a plaintiff thinks that the community plan goes further than the statute, all they have to do is raise that issue in their comments, which Alliance did not, and that's why it was waived. This comes down to a burden of proof issue for you. Absolutely. I see. And so, you know, if they had raised that claim, then the Forest Service would have had an opportunity if it chose to create a record on that issue, but they didn't raise it. But doesn't the service have a general duty under the APA to show its work, to explain its reasoning? No, to show its, well, explain its reasoning by saying it's relying on the plan, and that is consistent with the Healthy Forest Restoration Act. The definition of wild and urban interface in areas with a plan says that it is the area adjacent to an at-risk community identified in that plan. And that is the whole structure. It also has to be adjacent to federal land. Well, the at-risk community has to be adjacent to federal land, yes. Right, exactly. The at-risk community is also a statutorily defined term. Correct. And my understanding is simply being identified in a community plan, an area that identified in a community plan would not be statutorily compliant and be conceded at the start of an argument unless it actually satisfies the statutory definition, both of wild and urban interface and being within or adjacent to an at-risk community. So does the service not have some obligation to, I think you said before, verify through the process that everything is actually complying with the statute? No, that would be a procedural duty, and the Healthy Forest Restoration Act does not impose that duty to recreate or verify the analysis in the community wildfire protection plan. But a plan, I just want to make sure, you're saying a plan could define a wildland urban interface however it wants, and the Forest Service could just say, great, I accept that definition, no duty to confirm that it complies with the statutory requirements? So there's three lines of defense against that kind of abusive situation, which is what concerned the district court in Hanna Flats 1-2. The first is all the other requirements in HFRA about what it takes to do one of these projects in the categorical exemption. They have to be in the area previously identified as experiencing declining forest health because of the insect and disease. Which the Forest Service, you agree that the Forest Service would have to explain that in the decision document? No, that's another pre-made finding. The whole purpose of this categorical exemption is to allow the Forest Service to move quickly and not get tied up in analysis and litigation. Move quickly, but also lawfully. Absolutely, of course. I guess I'm with Judge Sung here, and I'm struggling with, we've got a federal statutory definition, and then we've got a community plan that seems to define the same term, and those definitions don't exactly match, and the scope seems different, and you want us to just ignore that. No, I don't want the court to ignore that. I want the court to... You want to put the burden on them to come forward to the district court to show why it doesn't comply with the statutory definition. And that is the burden of anybody challenging agency action, which has a presumption of regularity. Here's the problem I have. If this were a pure legal question, I would be more inclined to go your way on this. The problem is the definition collapses ultimately, as I see it, into the question of what adjacent means. You still have to be, the project, as I understand it, still has to be adjacent to the at-risk community. No, no. Well, the district court held that in Hanna-Flats too, but that is a plain error of statutory interpretation. Wait, so hold on. You don't think that the plan, you don't think the project area has to be adjacent to the at-risk community at all? That's correct. The wildland urban interface does have to be adjacent, but it's an area. Well, it is an area, but to me, the error in the district court was that the district court read adjacent to mean a but, and I don't think it does. But if we accepted your argument that it doesn't even need to be adjacent, you could have, that would open up the possibility for, this is what, 6,800 acres. You're saying that if you just did, say, the 1,000 acres that was furthest away, you could have a 5,000-acre buffer between the plan, and you'd say that's okay because it doesn't have to be adjacent. I'm sorry, Your Honor. I'm not understanding the difference between adjacent and a but. We would agree that the wildland urban interface, which is by statutory definition an area, not a line, and the district court made the error of turning it into a line, but that it must be adjacent to or within an at-risk community, and we've shown in the handouts to reply, Bruce, that it is. That's my question, though, is once you define an urban interface area, here that's 6,800 acres, right? That's not unusual. I know. But what I'm saying is once you get a 6,800-acre, what's the mileage on that? I don't know. I don't think there's any area in the project area that is more than about three miles from the nearest at-risk community. And you can see that in the map on... But the way I interpret it, here's the problem is that if we rule in your favor on either the first or the second case and this goes back down, it's not going to be the end of it because the district court's still going to have to determine whether this is adjacent. Your position is it is, but I think the district court's going to say, well, how do I determine whether it's adjacent or not? Is 6,800 acres adjacent? What if you defined it as 20,000 acres? Would that still be adjacent? It's not a question of acres. It's a question of it being, I mean, adjacent to be several miles, a band. If there's no community... That's the question. I think that's the question, is what is adjacent? What if this were 20 miles away? I mean, could you define it to include all forests within the state of Idaho? No, because there are other elements to the definition of community wildfire protection plan and of that risk community that require that there be a threat from the... So the threat is however far the infestation could go or the fire could go. Yes. I mean, it's not unusual to see four mile radiuses and things like that. But we presented a schematic of this in our reply to page 17. No, that was very helpful. And I agree with that in this case. But I guess my point is, and maybe this is the same question that everybody's asking, is at some point, don't you have to explain why that meets the definition of adjacent? Because if adjacent means abut, if adjacent means abut, wouldn't you have a problem here? Like the district court said that... I mean, I don't think it does mean abut. I think that's where the district court erred. But the district court said, you have to show that the project abuts the community. And you agree that that's error, right? I do. But the district court did that by interpreting adjacent. And so if the Forest Service hasn't explained what adjacent means, then how is the district court supposed to review their decision on whether it's adjacent or not? Okay. I think the district court came to that. It wasn't just interpreting adjacent. It was also mixing and matching different statutory provisions. And so the wild and urban interface has to be adjacent to the at-risk community. But it is an area. If there's no community wildfire protection plan, it can be as far as a mile and a half around the border. No, and I think the argument on that is mistaken, which is the district court sort of collapsed it and incentivized you not to create a plan. Because if you don't have a plan, then it only has to be within a mile and a half. And it's so clear from the statute that Congress intended to encourage these plans and that their expectation was that communities could apply their local knowledge of what resources they want to protect and what local federal land is a threat to that, that they would identify the areas using that local knowledge. How would they, if you have a community plan, how is Alliance supposed to come in and if there's no explanation for what the Forest Service thinks adjacent means, how are they supposed to challenge that and say it's not adjacent? Well, I think they would raise it in their comments on a proposal. Now in this case, they made a comment that the definition of wild and urban interface allows entities other than the general public to set the boundaries. So they actually admitted in that comment that the definition, the statutory definition, does allow communities to set the boundaries, which they now deny. But they just complained about the statute, that's all. They didn't say we don't think this project is in the wild and urban interface. They didn't say we don't think you can rely on a community plan. So you raised this as an administrative waiver argument, right? Waiver, yes. Could you point us to, in the record before the district court, where you raised the administrative waiver argument to the district court? It's in our, I mean it's in the motions briefing on summary judgment. The motions briefing, it's repeatedly captioned as the court lacks subject matter jurisdiction because the alliance didn't fail to administratively exhaust. No, it was, as in the other side's briefing as well and some decisions, the words exhaustion and waiver get used interchangeably sometimes. In the reply brief on appeal, you say they're clearly distinct doctrines. They are. One bars the entire suit. If there is an administrative review process and you don't avail yourself of it, you cannot sue. We've never made the argument that they have failed to exhaust their administrative remedies because there are none for this. But there's a separate doctrine. Also, can you please refer to your summary judgment briefing in the district court below. The heading literally says the court lacks subject matter jurisdiction. And you repeatedly use the terms fail to exhaust administrative remedies. Your Honor, I'm fairly certain that the argument was, I mean I don't have it here, but I'm fairly certain that the argument was that they had not raised this issue. It was issue preclusion, not the entire suit being barred. So, you know. I mean, maybe we might actually want to ask for supplemental briefing on this because this is a big question because I read it similar to Judge Sung that you had raised administrative exhaustion below. I mean, administrative waiver would not be a subject matter jurisdiction argument, right? Over that, certainly wouldn't be over the entire suit. I'd have to research that. I think there's a disconnect between what was argued below. And so the question where I think you might have a pretty strong or at least a colorable administrative waiver argument, I'm fearful that you might have waived it by not raising it before the district court. So we may, you know, we'll see what you have to say on Roboto, but we may ask for supplemental briefing. Whether it's waived or not, the court does have to reach the same issue in the Hannah-Flack Pew case, even if it finds that it, you know. Well, why? Because I don't think you raised it there either. Oh, no, no, no. We didn't say waiver. I don't think you have to reach waiver in either situation. I mean, you have to reach the question of whether. No, I agree. But that's very different than if we were able to rely on waiver. Right. And I just want to, in wrapping up here, I just want to emphasize that the. . . By the way, I think, I mean, we may have some more questions. So don't feel pressured at the time. Okay. Then I won't wrap up. I'll await your questions. Or maybe we don't. So I pulled the part of, well, at least one part of the briefing on this waiver question because we're all sort of thinking about this, of do we have to wrestle with your waiver argument or don't we? And so on pages 12 to 13, I think, the heading is, Plaintiffs failed to exhaust its administrative remedies for Claim 4. And then the argument about that is, neither plaintiff nor any other party raised Claim 4 during the administrative process. Plaintiffs submitted voluminous comments on the scoping notice, but none of these comments are remotely similar to Claim 4, which asserts that the Forest Service has not shown that the project is located in a wildland urban interface. And it goes on. So I guess your argument is, however you labeled it, you have been arguing below and now consistently that what the Alliance Party has failed to do is put the Forest Service on notice that they were challenging that the federal statutory definition was satisfied here. That's right, Your Honor. And in the Portland General Electric case, which is cited in our brief, this court explained that those terms often get mistakenly used interchangeably. And so if that happened, I apologize for that. But the argument was clearly that this particular Claim 4 about the Forest Service hasn't affirmatively independently mapped and proven that the community plan was correct, satisfying a procedural duty not found in the Healthy Forest Restoration Act to analyze and show the correctness of the community plan, that this claim was never presented to the Forest Service, nor really anything like it. All they did was complain that the statute does allow local communities to define the boundaries. And another wrinkle. I think that maybe that's fair, although Judge Tung's point is well taken, that when you start throwing around the words jurisdiction, then it seems less of a labeling problem and more of a you're talking about two different things problem. The other problem with this issue is, of course, we're bringing this up sui sponte. I don't read Alliance anywhere in their briefing to say that you waived your waiver argument. So is that something that we should be doing? Well, I certainly want to say no. I mean, they have certainly forfeited any argument by not raising it in their answering brief that we can't make that argument. We certainly did make it below, even if there were some other words that were inartfully used. This is where we might need some supplemental help. Yeah. No, this is helpful. On mootness. One question I had. I mean, I take it. The Forest Service position is, look, we will go back. We think that we were right the first time. We intend to go back to that if given the opportunity. And that resolves any mootness question here. We did a supplemental, but that was under protest. Does it really even matter at the end of the day? I mean, because you made the same arguments in HANA 2 that you reiterated your arguments that the original supplemental or the original decision memo was correct. So do we even need to reach mootness, or wouldn't that be raised in a second case as well? I mean, courts always have to address their jurisdiction, I guess. And I would just – I mean, the issue is before us, whether it's in HANA 1 or HANA 2. That's correct. It is before you. We would like to be able to withdraw the supplement, and we can't do that unless you reverse in HANA 4. But theoretically, you could do that whether we ruled for you in HANA 1 or HANA 2 on this issue. I suppose you're correct, Your Honor. The other thing I'd just like to quickly point out about the mootness issue is the Supreme Court's decision in Norfolk and Western Railway versus American Train Dispatchers, which was a very similar situation where the agency had been – there was a remand. They completed the remand. They issued a new order. One of the other parties in the Supreme Court said, well, now there's no jurisdiction. And the Supreme Court said there was, in part because the court may have objections to the new order as well, so the parties still have an ongoing interest in the original order. And that is true here too, and that's why there is jurisdiction in that case. I just want to go back to why the service wants the additional quarter in HANA 1 vacated. Is the service's position that in making a decision about whether the categorical exclusion applies, it has no duty to verify that the wildland-urban interface defined in the community plan complies with the statute? It has no duty to, as the court said in the Oregon Natural Desert Association case, to analyze and show. Now, the claim that Alliance chose to bring – they're a very sophisticated repeal litigator. They didn't bring a claim saying this project is not in the wildland-urban interface. They brought a claim saying the Forest Service has not established by independently mapping. That's the claim they chose to bring, and the Forest Service has no such procedural duty because the Healthy Forest Restoration Act doesn't provide it. So you're saying the service has no duty to analyze and show that the community plan's definition of wildland-urban interface meets the statutory definition. That's right. So it can just accept whatever definition – your position is it can just accept whatever definition of a wildland-urban interface is in a community plan, full stop. I mean, that's assuming you're going to – It has no duty to analyze it. You're saying it just can – whatever the community plan says the wildland-urban interface is, the service can just accept it? Is that your position? They have no procedural duty to show that it is correct. Let's put aside procedural or substantive because you can argue that it's both. Substantively, it has to be correct. So if the Forest Service looked at this and said this is a bad community wildfire protection plan, then it would not move forward with a project saying this is in the wildland-urban interface because they might feel that it didn't meet the statutory definition. But when the Forest Service does make a finding that a project is in the wildland-urban interface and it's relying on a community wildfire protection plan, the statute provides that the wildland-urban interface is what the plan says it is. They can challenge that, but they'd have to pretty much challenge it. Well, it doesn't actually say that. What it says is the wildlife interface has to be in the plan, but then it says it has to be within or adjacent to an at-risk community. It has to be. That's what I keep coming back to because I don't know how it's intuitive to a district court. I mean, that's why I keep trying to analogize it between the difference between a legal argument and a factual argument because you're right, if it's a legal argument, then the district court, the courts, we're very capable of handling legal arguments and figuring out what cases say. When you get a question of whether it abuts, that's not intuitive. Excuse me. See, there I go. Whether the question is whether it's adjacent, that's not intuitive to us because that could have various regulatory definitions. I mean, you could define adjacent regulatorily in many different ways, and so that doesn't seem to me to be a legal question that we could look on the face and say this is correct or this is not. And your point is that's their duty. They have to put that issue in place. I just want to make sure I'm understanding you correctly about the confusion about what adjacent means. I thought it just meant next to. You better not just think it means next to because you've got a problem. No, it's an area, though. It's a band. It's not a line. But the district court said it means abut, and I don't think it means abut. I think it means near, and then the question is what does near mean? I mean, isn't that how these cases are going to come down? Because at some point the question is going to be is this adjacent? And if it's 20 miles away, that might not be adjacent. If it's three miles away, that might be adjacent. So the thing that needs to be adjacent is the wildland-urban interface, which is an area identified in the plan. It has to border. Just like it does in the, if there is the community wildfire protection plan, then the statute's B definition of the wildland-urban interface says it's the first half mile out and up to a mile and a half if there's fire breaks or if there's steep hills or other things to protect and can be quite far away if there's an evacuation route, which in this project there is. So it has- But see, that's my point. Adjacent means different things in different contexts. And so it seems to me that the Forest Service has to bear some burden to explain why it's adjacent. The statute assigns that task to the community, which consults with the Forest Service but is not subject to Forest Service approval. Now, if somebody thinks- So you think we have- So do you think the community plan has to define why it's adjacent? I'm not finding the same difficulty with the word adjacent than you are. The statute doesn't define the width, right? If there's no community protection plan, 1.5 miles. If there's not- But those are adjacent. They're adjacent to the community 1.5 miles out. If there's no- If there is a plan, then it's what the community finds is needed for protection. It could be more than one and a half miles. But it's still next to the community. And so I think that's what adjacent means is this band encircling the community, encircles the community and touches it, but it still has width. And the project has to be in that band. And that makes it in the wildland-urban interface, which is all that the statute requires. The confusion that the district court got into- And this is a- It's a hard statute to read. You're always slipping, you know. But it confused the definition of at-risk community, which requires that the community be adjacent to federal land, with the definition for wildland-urban interface, and then with the requirement that the project be in the wildland-urban interface. But nothing says the project has to be adjacent to or abutting the community. It just has to be within that area. What if the community then defines the wildland-urban interface as a hundred-mile radius in any town? You know, you seem to be saying that the community plan, as long as the community plan decides that fits within the definition of within or adjacent to an at-risk community, that's good enough for the Forest Service to just say we're relying on that definition. We have no duty under the APA to show-to analyze and show that that definition complies with the statute. That's right. There's no procedural duty, but that doesn't mean it wouldn't be a substantive error. And there are other statutory provisions that address that concern. The definition of at-risk community in some provisions that haven't been relevant to this lawsuit requires that an at-risk community, in addition to the things we've discussed, adjacency or the interface community, has to be one in which conditions are conducive to a large-scale wildland fire disturbance event and for which a significant threat to human life or property exists as a result. So there has to be some – if it's a hundred miles away, there's not much of a threat to that community, right? I think the district court is saying basically there was a challenge to your decision approving the project as arbitrary and capricious, and the district court goes to try and figure out whether the decision was arbitrary and capricious, and it just did not have enough information in the decision to make an assessment because all it did was simply conclusive or at least assert that the project is within the wildland-urban interface by referencing a community plan that simply asserted a definition or adopted a definition of wildland-urban interface that doesn't match the statutory definition, and all the district court said was you need to at least give enough information that I can assess that the decision complies with the law. Well, part of the reason the district court couldn't assess that is because Alliance didn't raise this issue in its comments. If it had, the Forest Service would have had notice and an opportunity to create a record on that issue. You have no duty to explain that basis for that decision, that the project is within the wildland-urban interface, which is a statutory requirement, and you didn't have to explain that aspect of your decision regardless of whether there was a comment challenging that. Not when there's a community wildfire protection plan because by statutory definition, and this is something Alliance used to argue, by statutory definition, the community wildfire protection plan identifies the location of the wildland-urban interface. The statute doesn't say wildland-urban interface is whatever community plan says it is. It says the wildland-urban interface is an area within or adjacent to an at-risk community identified in the community plan, and then it also has Part B and Part C, which are the conditions showing essentially risk to wildfire. So why isn't there some statutory duty under the APA for when the Forest Service is saying this project is within the wildland-urban interface to show that the wildland-urban interface it is using actually complies with Part A, B, and C of the statutory definition? Well, there's a couple of reasons. Two reasons for that. One is in the statutory text and the other is in the statutory purpose. I gather you're not agreeing with me about our statutory text interpretations that this is what Congress said, that it is assigned to the community this role to identify the wildland-urban interface. That doesn't mean it can't be challenged. That doesn't mean it's not subject to judicial review. It just means it's presumptively valid and the Forest Service may rely on it. The Forest Service doesn't have to if it doesn't think, you know, if it's abusive like that. It doesn't have an independent duty to defend it. It might be deficient, but that's for alliance. If it's deficient and the Forest Service presumably disagrees and still chooses to rely on it, then any person can raise that issue in their comments, give the Forest Service an opportunity to address that concern, perhaps create a record on it. Moreover, we've shown in the reply brief that this actually does comply completely with the petition. Can I just ask a practical question? At the end of the day, if we reject your argument, but we say we reject your argument in one but we uphold it in two, tell me the practical implications going forward. Earlier you said, well, we've got to move quickly. If we give – I mean, you were still able to move quickly. One month later you come out with a second decision document. Would we be imposing that heavy of a burden on the Forest Service? It doesn't seem like this is requiring – what the magistrate did in the first case didn't seem to be imposing a huge requirement. It didn't say go do an EA. It didn't say, you know, take years to do this. So tell me the practical implication. If the analysis that's in the supplement is sufficient, then I don't think the Forest Service should have to do it as a magistrate, but I've got to admit they were able to do it quite quickly. But the plaintiffs have argued that that does not comply with the judgment, that it's not sufficient, and we need to show the density of housing and all these things that would impose a lot of burden and time on a process that was designed, as this court held in Center for Biological Diversity versus Lano, to allow – the whole statute is designed to allow the Forest Service to move more quickly. So look, trust me, I hear you. I mean, you don't want to get bogged down in these years. But this one doesn't seem to be one of those issues. So I just wanted to hear your response. It's just that – I mean, what they've asked for is, you know, density, very, very specific stuff. I understand. And so that would be burdensome. But if we upheld the analysis in Hannah Flats 2 in the second decision memo, then we'd basically be rejecting those other arguments anyway, right? We would still ask the court not to do that simply because it would open up so many more grounds for litigation. I hear you. Yeah. Let me – if we were ruling your favor and send this back down, the alliances said – well, if we were ruling your favor on these two issues, the alliances said, hey, there's still reason to keep the injunction in place because of the impact on grizzlies. And I think there was another issue I'm forgetting now, the violation on the limits on new roads. And is it your position we should reach those issues? I don't feel like we have a factual record that would allow us. That's correct, Your Honor. It was not passed on by the court below, and this court's usual policy is not to decide issues that were not decided below. There are exceptions to that, but they don't apply here, such as when it's really obvious which way it should go or when it's purely legal in nature, which is just anything but. Unless, of course, the court accepts our argument that this is decided in lands council and that whether or not – the question of is the Forest Service in compliance is a road by road. Is this gate good enough? Is this road actually listed as closed or is it listed as restricted? A lot of very picky, factual things there. But what is undisputed is that this project is going to reduce the number of roads in this project area. And therefore, as this court held in the unanimous in-bank decision in lands council, even if there is a violation of a forest plan standard, that doesn't freeze everything on the forest. If the particular project under litigation doesn't worsen that violation, then the project can't be held to be violating that standard. A couple more questions on that. If we do rule in your favor on Hanna Flats 2 and we send this back, what do we do with the balancing of factors? If we say the district court erred as a legal matter, does that just by necessity require a revisitation of it? Because the equities seem to be, well, I found that you violated the categorical exclusion. But if we say, well, you haven't found that, doesn't that just sort of wipe out the equities and the district court would have to review that on remand? Well, without a legal violation, then you can't have an injunction. It's the thing you must absolutely have. And what this court has held is if they haven't shown a likelihood of success on the merits, then there's no need to even address the other factors. Well, the Ninth Circuit has suggested that if it's a serious question. Oh, sure. That's why I say a sufficient likelihood of success. We don't agree with that, but it is there. But if there isn't a sufficient likelihood of success on the merits, which in Hanna Flats 2 on the wild and urban interface issue, we certainly don't believe that there is, then there's no basis for an injunction regardless of what the equity is. My other question was what's practically on the ground? I take it there was work going on between 2018 and the time that the injunction went into place in 2021. Nothing that I'm aware of except I think a few trees were removed for safety reasons. Oh, I see. Because there was no injunction in place until 21, but there was no work actually done under the plan. No, the project hasn't started going forward yet. Are you waiting for a ruling from the court? Do we need to try and move this in the next month or so, or is the idea that the work wouldn't begin until the spring anyway? I don't know the answer to that, but I have not been told that there is that kind of urgency. Obviously, we're under injunction. We'd like to not be and be able to move forward with this. This is one of many you're dealing with, I assume. I'm sure that's true. I just have one more question about Hannah Flats. In your briefing, you seem to preserve your position that the district court's interpretation of subpart little i of the at-risk community definition, you say you disagree with it, but we don't need to address that. If we agreed with you on your interpretation of sub two, it seems to me you've asked us to just not address the district court's interpretation of sub one because it wasn't briefed. You said we don't need to reach it. Just go straight to two. I just want to confirm that's your position. You're not asking us to revisit the interpretation of sub one. That's right. We haven't briefed that, and it wasn't the basis that the agency relied on in the supplement. Thank you, Your Honor. We'll give you time for rebuttal, too. Thank you. I appreciate that. Good morning, Your Honors. May it please the Court, my name is Rebecca Smith, and I represent Alliance for the World Rock. You see Apelli in these cases. I'd like to just start addressing some of the questions you've already asked unless you have something new. I think I know what your questions and concerns are in this case. I think I want to start today by looking at the definition that was in the Bonner County Plan, and we can find that in the district court's decision 535, fed sub third at 966 to 967. So the 2016 definition was that the wildland urban interface is, quote, an area where developed lands interact with undeveloped lands and includes the infrastructure and natural resources communities rely on for existence. Location, it is found in remote, scattered development areas to highly developed urban areas and everywhere in between. So that definition could basically be applied anywhere. And consistent with that definition in the Bonner County Plan, almost the entire county. There are restrictions in the statute. That seems to be what the Forest Service is saying. I mean, you couldn't have a community plan that says, okay, all forest land in the state of Idaho or all within, you know, 100,000 acres. There's some actual limitations that are still coming in other areas. And the flaw in that argument is that, Your Honor, in fact, they did map almost the entire extent of Bonner County as well then, urban interface. Where is that in the definition? There is a map in the supplemental decision memo, and I believe that's in the Hannah Fletch's two excerpts of record. This is at ER 86, and it shows almost the entire county here is mapped  And so, you know, it's not a high burden to get over that first requirement, that there's a risk of disease and insect infestation, and that there's a risk of wildfire. Because almost all of the northern Rockies have experienced insect disease and wildfire for millennia. And so it's really a very low burden to say that there's insect disease and wildfire risk. And so that is why almost... Well, if that's true, I mean, I think I agree with your argument, but let me just push back slightly. I mean, if infestation is that much of a problem, that seemed to be what Congress was trying to solve. And so if infestation can go several miles or, you know, the entire state of Idaho, then why wouldn't it be okay to have a community plan? I mean, I'd never understood it to be that much of a problem, but... Well, Your Honor, it's just an endemic issue. Insect infestations are an endemic issue in forests. And what we've seen in peer-reviewed scientific literature, like what we cited in our answering brief, is that although 20 years ago, when the Healthy Forest Restoration Act was first approved, 20 years later now today, we know that insects actually choose genetically for trees. But that's a policy argument that we don't have jurisdiction to... We don't have the power to do that. The Healthy Forest Restoration Act. So in case it just says that, you know, an at-risk community means an area that is within or adjacent to federal land or group of homes and other structures of infrastructure, and then there has to be some showing that the conditions are conducive to a large-scale wildland fire and some significant threat to human life or property. And so is it... I mean, to Judge Nelson's question, you know, if you're saying that that's a relatively easy bar to meet, you might disagree with the bar being set that low as a matter of policy, but that's what the statute does. We don't disagree with what the statute says. We do not disagree with the statutory definition of wildland-urban interface because it incorporates that statutory definition of at-risk community, which in turn is two different things, either the interface definition in the Federal Register or a group of homes with basic infrastructure. We don't dispute that. What we're saying is that this Bonner County 2016 definition is not consistent with that. It's not limited in those ways. Certainly on its face, the words don't match. I think we can all recognize that. The words of how they define wildland-urban interface don't match the statutory definition. I think the services position seems to be that, you know, that's okay. As long as there was no comment during the scoping, after the scoping notice, during the comment process, pointing out to us that the wildland-urban interface as defined in the community plan doesn't match the statutory definition, we have no duty to show that the wildland-urban interface we're using complies with the statute. And we strongly disagree with that argument, Your Honor, in part because they're using this definition to exempt themselves from the National Environmental Policy Act. But it's a definition that Congress passed. I mean, you know, you seem to be saying, well, it's not fair because NEPA imposes all these requirements, but Congress said we're exempting them from NEPA for this. So if they satisfy, I mean, it doesn't mean that we should interpret this, you know, more restrictively just because the impact is great. We need to review it straight up. Correct, Your Honor, but as you just noted, they're only exempted if they satisfy the definition. And I would point you to this Court's precedent dealing with categorical exclusions from NEPA, such as California v. Norton, 311, Fed 3rd at 1178, as well as Jones v. Gordon, 792, Fed 2nd at 828, as well as a number of other cases, High Sierra Hikers. And those are all statutory categorical exclusions or regulatory? So far they're regulatory. There's also Health Canyon Preservation Council, a district court case, which was actually a budget right or a statutory CE. And so it runs the gambit. And in every one of these cases, these courts are saying, if you want to use a categorical exclusion, you do have to have a reasoned explanation in the record for your actions. And so it's not really that different than the normal burden under the Administrative Procedure Act to have a reasoned explanation. And that is really all that the district court found in Hanna Flats 1 was that it was missing that explanation. But in Hanna Flats 2, the district court never actually reached this question, right? Because it just sort of said, this fails out of the gate. You don't seem to be defending the district court's reasoning in Hanna Flats 2. We agree with the district court's reasoning in Hanna Flats 2, Your Honor. I didn't read that in your briefs. You seem to sort of be suggesting we need to be looking at these other reasons to keep the injunction in place. So you agree that your interpretation of the statute is consistent with the district court's, that the communities have to abut the project itself? Yes, Your Honor. So just to take a step back, we're going to skip past the interface community definition of Part 1. We're moving to the group of homes. Yeah, because you still think that even if we reject the – well, go ahead. Okay. So assuming that they didn't comply with that first part, the interface community, we're now talking about whether the group of homes are within or adjacent. And the question you're asking is, what does adjacent mean? And your perception here is the district court basically created a definition that's not in the statute. And our position here is that there is no definition anywhere in the record of what adjacent means. And we actually agree that it could be good practice for either the plan to define adjacent or the agency decision to define adjacent. Another option that's open to the Forest Service here, because this is a statutory categorical exclusion, would be to define it in a regulation and then receive deference for that definition. But none of those things happened here. And just to be clear, in the definition of wildland urban interface, I think the district court interpreted two things, both what does it mean for an area to be within or adjacent to an at-risk community, which then refers us to the at-risk community definition. What does it mean for the group of homes to be within or adjacent to federal land? Does that federal land have to refer implicitly to the project at issue or is it just any federal land, which is the district court's, excuse me, the service's position is that by its own terms, it just says federal land. It doesn't say the federal land at issue in the project or the project so that we can't read those words into the statute. So as far as that part of it is, the meaning of the word federal land in the definition of at-risk community, do you agree that that, do you agree with the district court that that means the federal land at issue in the project or do you agree, concede that it's just any federal land? We agree with the district court, but I have two responses for that. The first is that these two communities, Lamb Creek and Nordman, both have areas of private land and federal land that are not this project area between the project area boundary and the community. So even if it was any federal land, that still brings up the question, but there's still these areas of private land between the project area and these communities. Second, we do agree that federal land means in this project area because it is the project that has to be in the wildland urban interface, and I want to just talk a little bit about that diagram that the Forest Service put in its brief. Basically what they did was say if there's an at-risk community here and then there's an at-risk community here, then we can draw an unlimited circle around those. I didn't say it was an unlimited circle. It didn't say unlimited, but there was no proposed limit. It was a circle around those two with communities on either side, and then they said anywhere in between we could have a project, regardless of whether that project is actually interfacing. The wildlands in that project are actually interfacing with that urban area. Again, wildland urban interface is talking about where the forest lands, the wildlands interface with the urban communities. So what they're saying is that doesn't really matter. If we draw a big enough circle, we can put a project anywhere between those two communities, and the problem with that in the West is that you could pick any two communities, say they're at risk, draw a circle around them and put a project. I take your point somewhat. That's why I think there's something to this adjacent, and that's why I'm hesitant to go along with what the forest services in Hannah Flats want. But adjacent must mean something, and the question is whether the district court got it wrong when he said adjacent means abut. I think adjacent and abut are clearly different concepts, and so if that's true, then the district court just flat out got it wrong and we've got to send it back. Well, then the question is, is adjacent over a mile away? Is adjacent three miles away? Yeah, and I agree. That's why, I mean, as I'm thinking through this, I think the Forest Service has to explain something about adjacent. I'm struggling with why they seem to suggest they don't need to, but they seem to have done that at least in Hannah Flats. Under protest, they seem to have done that in Hannah Flats too. So I guess we don't know whether if we reject the district court's argument, they're still abut. I mean, you're going to go down and say, well, even if it's not abut, it's still not adjacent under a broader definition of adjacent. And, Your Honor, to add a little bit more to that, in Hannah Flats too we're just at a preliminary ruling of serious questions, and so the judge isn't saying as a matter of law you win. I wanted to ask you about that because serious questions only comes in. So the problem I had with the balancing of the factors with the district court, because that's how you get to serious questions is you say, oh, it's clearly. But the district court recognized that there were serious harms or serious interests on both sides. But then it went in and said, but the balance tips squarely in favor of alliance. And to me that logic just didn't flow. Like to me if it tips squarely in favor of the alliance, what you're saying is alliance has really strong interests, the Forest Service has no interest. But the district court didn't say that. It said both sides have really strong interests. I would expect you to say, can you show me a case where both sides have really strong interests and the court has still gone back to the serious questions? In almost every Timberdale case that does happen, Your Honor, because there are interests on both sides. Interests are similar in all of them. Yes, they are. This is the problem I have with our serious questions. But that debate is for another day. And, Your Honor, I think that one thing that really compelled at least the district court in Hannah-Flats One was the notion that this categorical exclusion is, it seems to be that the agency is saying it can sort of self-invoke this without any check. It can say whatever is in the plan is the wildland or an interface. If it's in the plan, we can exempt ourselves from NEPA and nobody can check that. And that strips away that public ability to participate in public lands. And I think that that was really a compelling interest that the magistrate judge in Hannah-Flats One raised and that could also be a factor. Can you? Oh, go ahead. Well, I'm going to switch gears. Oh, yeah. I was too. You go ahead. I want to talk about waiver. So Oregon Natural Desert Association, our decision in that case, I read that case and it seems like there's a strong argument for the government that you have waived this whole challenge by not bringing it up in the notice and comment period. Why is that wrong? Thank you, Your Honor. First, I want to address that it was an administrative exhaustion jurisdictional issue that was raised in the district court that the district court rejected. You didn't make that argument to us. I'm sorry, Your Honor. I don't think you made that argument. You're suggesting that, never mind. Sorry. Go ahead. No, I'm actually interested in the question. I mean, you can answer it, but I still want to hear Judge Forrest's question. So what our argument was in the district court and this court is that, number one, when you have a categorical exclusion, the agency is exempting itself from the NEPA public comment process. There's no EA, so there's no EA comment. There's no EIS, so there's no EIS comment. And this specific categorical exclusion also exempts the agency from any administrative appeal process. And under Darby v. Cisneros, the U.S. Supreme Court has held that there has to be a statutory or regulatory explicit requirement to require administrative exhaustion. And so in the district – I get it, and yes, we have some factual differences in terms of the administrative process that was going on in Oregon Natural Desert and other cases to this one. I get that point. But it still remains that there is a principle out there that a challenger to government action needs to bring that challenge to the government's attention in a way that the government can respond to it pre-litigation. Otherwise, we call that exhaustion in some contexts, or we call that waiver in other contexts, administrative waiver in other contexts. And so here, under the sort of reasoning and development of how the comments were looked at in Oregon Natural Desert, it seems like there's an analogy to be drawn. Except, Your Honor, that every case that the Forest Service has cited, there was an administrative exhaustion requirement. All of those cases – Idaho Sporting Council, Sporting Congress v. Rittenhouse, all of – Lands Council – all of these cases had a full NEPA process and an administrative appeal process, and so it was administrative exhaustion. But do you have a case that says that in this particular context, there is no requirement for any challenger to bring it up pre-litigation? That would be Darby v. Fisneris, which says that where the APA applies an appeal to superior agency authority is a prerequisite to judicial review only when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review, and that's 509 U.S. 154. That's – the Supreme Court says that. And so when we talk about waiver, most times you're citing back to cases that actually had an administrative exhaustion requirement in a statute or regulation. And so I would just – you know, I want to be really clear about that. I think you never had a duty. Your position is we don't need to reach this because you never had a duty to raise it to the Forest Service beforehand. And that's what – yes, Your Honor, and we said that to the district court, and to Hannah Flats one – the district court and Hannah Flats one in a footnote essentially said I'm not touching this issue and then went on to address whether we had sufficiently raised it in comments. And what the Forest Service has represented, you know, just to give a little more facts, you know, assuming that you want some kind of notice in the record, what the agency has said today was not the full extent of what Alliance said. Do you have any – I mean, I've read what you have in your brief. Do you have anything else other than what's in your brief? No, Your Honor, just that we did request a map of the density of human residences within one and a half miles from the project unit boundaries. That's at 2ER212. We did say please disclose the exact criteria for a place to be designated, 2ER214. I've got to say, if we get that far in the analysis, man, I think Oregon Natural Desert is really tough for you because in that case there were also comments made that were sort of generic and general and are sort of around the edges of the thing that ultimately gets disputed in litigation. And the court says not enough. You've got to be clear about what your challenge is so that the government can respond. And that's this case. Yes, are you around the edges? Probably. Are you really bringing to the government's attention that you think that they are misapplying the federal statute? I don't think so. Then, Your Honor, one last site I'd like to give you is at 3ER355. In the scoping notice, the Forest Service itself acknowledged the public concerns, quote, questioning the need for fuel treatments in the project area, the effectiveness of proposed fuel treatments, and whether the treatments would help protect structures. So substantively, when we're asking for density, when we're asking for condition class, when we're asking for whether there's really a need for fuel treatment, that is substantively a question about whether you need to log this. We're trying to pressure test. Your position seems to be, well, they never provided any of this in the record because they're saying they don't have to. We're trying to pressure test it, so we're asking for this information. They're not giving it to us. So how can they come in and say, well, you didn't challenge it because you don't even have the information before you to challenge it. Right, Your Honor. So when a member of the public says, please give me a map of all the structures within 1.5 miles, and the Forest Service says no. Okay. What about a waiver, the administrative waiver? You have never said, I mean, you've said we never had a duty. Okay, so maybe that's right, maybe it's not. If that's wrong, and you did have a duty to raise this more explicitly, and we say that they will see what we say about the waiver, whether they didn't raise this below, whether they raised the administrative waiver, the exhaustion below. Assuming that we thought that they might have waived it below, you didn't point that waiver out. Have you waived the waiver of the waiver argument? And have we entered a law school exam that is unanswerable? I think so, Your Honor. You know, we're just going to rest on this. You know, there is no administrative exhaustion because of the categorical exclusion, and so that was their argument in the district court, and that was never a requirement. In the services opening brief on appeal, did they – I mean, part of the problem here, it seems to me, that the service made an exhaustion argument below. On appeal, they made an argument that maybe it was exhaustion, maybe administrative waiver. Your answer in brief treats it as an exhaustion argument, which I think is understandable because that's the best characterization, I think, of the services argument below. And then in the reply brief, the service comes in and says, I don't know why the alliance is arguing exhaustion. We're making an administrative waiver argument. Under those circumstances, I find it a little bit hard to say that there was a waiver of the waiver argument when I think any sort of assumption on your part that what the service was appealing was the exhaustion determination was reasonable. Yes, Your Honor, and, you know, I'm just looking at their opening brief now, and they use the phrase administrative exhaustion in the opening brief, you know, and so we're responding in the – Aren't there a lot of administrative sources that tell us that administrative exhaustion and administrative waiver are basically the same thing with two labels? And if they are, Your Honor, it still goes back to Darby v. Cisneros, which says there has to be an explicit statute or regulation to require that, and it might very well be that they have been so conflated that they are the same. That's a stronger argument. Yes. Which is why you're standing on that today. Yes. All right, I have one other question for the practicality of this. If we disagree with you and decide that you waive this challenge and therefore you lose HANA 1 for a waiver, what happens to HANA 2? Well, Your Honor, that is a separate supplemental decision memo, and that lawsuit would still stand challenging that supplemental decision memo, and then it might very well be that we would amend the complaint to remove the Wildland Urban Interface claim, but there would still be other claims against the project. There wouldn't be an administrative waiver argument as to the second decision memo because it never went out. Well, that's correct. Yes, Your Honor, that is correct. Okay. There was never any opportunity at all to comment on that supplemental decision memo. So maybe I was having too much fun with the idea of a law school exam and how complicated I could make it, but I want to be sure that I'm understanding your position. Your position is that that second decision stands on its own. Yes, Your Honor. So if we get rid of decision number one, decision number two is still standing. And still being challenged because all we have right now is a preliminary ruling and the summary judgment issue hasn't been briefed yet in the district court. But if we rule against you, if we said there was waiver and we ruled against you on the first one, then we'd go back presumably, you know, the first decision document would spring back in and then I suppose we'd say that's valid and therefore we wouldn't have to deal with, would we then still have to deal with Hanna Flats 2? If you found that the district court was incorrect in Hanna Flats 1. Then Hanna Flats 2 would go away because we'd say the Forest Service, we could actually theoretically rule on summary judgment. We could have, oh my gosh, we could reverse. Now you're making it more complicated. Yeah, okay. We're going to go figure this out. We don't need to do this in live time. In Hanna Flats 1, if we just said that there was a waiver, right, and then we're not reaching the merits of Hanna Flats 1 because of a waiver, theoretically then what the service is asking you to do is then withdraw the supplemental decision. If that becomes a legal malady because the service is permitted to withdraw it, I guess I'm wondering what is the basis of Hanna Flats 2? Well, then it would be an amended complaint challenging the original decision memo, right? Okay. Thank you, counsel. Not that time means anything, but we'll try and limit it to three minutes. I just want to touch quickly on a few of those points. First of all, I flatly deny that our opening brief argues administrative waiver. It does not. I said it out of exhaustion. These terms do get confusing, especially when you've been talking for a long time. But we absolutely clearly made a waiver, also known as forfeiture argument, and the only times we used the words administrative exhaustion in that brief was to drop a footnote explaining the difference. In the district court. Oh, I'm talking about our opening brief in this case. Oh, I want to know about the district court. Yeah, I'm sorry. I just don't have that information. But certainly, in our opening brief, we made a waiver argument, and they chose to respond with an argument that just didn't meet us head on. And our position is that they didn't raise this claim before the agency. They certainly knew how to do that. They certainly could do that. And that goes to this argument they're making, that we can exempt ourselves from NEPA and nobody can check that. That's simply not true. All they have to do is make a comment. And this may have been a categorical exclusion, but there's also a two-year environmental review process with meetings and field trips and a 44-page scoping notice. That's the first decision, correct? But the second decision document, does administrative waiver apply to this? We haven't made a waiver argument with respect to the supplement. But the supplement doesn't exist without the judgment in Hanna Flats I. So if we rule for you in Hanna Flats I, does that take away Hanna Flats II, in your opinion? It depends the timing of the court's decisions. If the court were to rule first in Hanna Flats I and then the agency to withdraw the supplement, then that would moot out Hanna Flats II. So we could issue a decision, okay, if we go that route, but if we just did this in one combined, then it wouldn't moot it out. We'd have to address both. The injunction still exists. And so the court has jurisdiction over the injunction, and unfortunately that requires a resolution of both questions. But if we rule for it, sorry, and we'll give you as much time, but if we rule in your favor in Hanna Flats I, wouldn't that just be a grounds in and of itself to vacate the injunction? Because if we ruled for you in Hanna Flats I, that was on summary judgment, I assume what we'd be doing is ruling that you're entitled to summary judgment and therefore you would be in the clear on this, I think. I don't know. We've got to think about that more. But I think if we did that, then we'd say Hanna Flats II, the injunction is vacated and we're done. Right, yeah, and then we should not have to litigate about the supplement. They can continue to litigate their claim about the roads. But the problem with that is you could have sought a stay and thought all about the decision number one, but instead you decided to have dual courses going on and issue decision number two, and so we can't just pretend that doesn't exist. Oh, I'm not asking the court to pretend it doesn't exist. We're just talking about what the impact of one decision would be on the other. I understand the mootness argument if you were to withdraw decision number two, but as long as decision number two has not been withdrawn, I'm not seeing how a decision in number one that goes in your favor automatically means that decision two falls apart. No, it just undermines the legal reasoning behind the finding of likelihood of success on the merits because in Hanna Flats II, the district court reiterated the Hanna Flats I holding. Certainly if the Forest Service has no procedural duty to analyze and show that a project is in a validly defined, in an area where there is a community wildfire protection plan, has no affirmative duty to kind of disprove their suspicions before they raise them, then that would undermine the whole reasoning on which the objection was based. It kind of depends on whether we – I mean, if we didn't – if we ruled Hanna Flats I just based on waiver, we wouldn't be reaching the merits, so there would be no impact on the reasoning of the district court. That's a good point. That's a good point. So if the decision in Hanna Flats I were limited to waiver, then it would just be sort of kind of – what's that word? Prospectively moved or something like that, given that the Forest Service is going to withdraw the supplement. We still have to address the merits of it in Hanna Flats II. Unless you issued one decision prior to the other. And allowed you to withdraw for a second. Yeah. Yeah. Okay. So I want to just quickly touch – Kelsey talked about how broad the definition in the Bonner County plan is, and I think the problem we're having here is that the word definition is being used in two senses. They talk sometimes about how the plan can define the wildland-urban interface, but what they really mean is identify its location. The definition in the Bonner County plan about what that term means, wildland-urban interface, is correct, and it has no legal meaning. I mean, it has no legal effect. What has a legal effect is the area they identified in that map. I want to go back to your interpretation of the wildland-urban interface statutory definition. If I understand you correctly, you seem to be saying that the clause that says that is identified in a community plan applies to an area. Uh-huh. To me, there is some ambiguity here because it could also refer to an at-risk community that is identified in a community plan, and then there's still a statutory independent thing where the wildland-urban interface has to be an area within or adjacent to that community that is identified in the plan. So do you have precedent or other statutory? You seem to be assuming that that clause about what's identified in the plan refers to an area. What is your evidence or argument as to why we should interpret it that way? I've got at least two pieces of evidence for you. One is look at the definition of community wildfire protection plan, and it says that the plan is something that is created by the community and it identifies the area. Now, I agree with you that that definition is ambiguous on that point, but when you read it in connection with the definition of community wildfire protection plan, it's clear that what the plan identifies is not the community that wrote it, or the communities within that county, but the area. The other thing I would point out is if it were otherwise, if the thing that has to be identified in the plan is the communities, then this definition would not actually tell you where the wildland-urban interface is. Right now it tells you where it is. It's the area identified in the plan. And the second definition, the B definition, is all about where it is. So I think it's reasonable to construe those consistently, that the purpose of this definition is to tell you where the wildland-urban interface is and to do that, the area. The other thing I would point out is take a look at Alliance's reply brief, in the other case, 1835653, page 1, and see where they put the emphasis in their reproduction of this definition. I think they agree with us. All the claims in this case have been about the area identified in the Bontra County plan, not a list of at-risk communities. And also the guidance of the Wildland Fire Leadership Council, that the statute actually directs communities to follow. It also tells the communities that they identify the area. So the statute is ambiguous, but I think the interpretation is clear. Regarding this definition, yes, a lot of this county is in the wildland-urban interface because 85% of this county is forest. So there are counties like that. Not every place is going to be like that. You know, Seattle is not going to be like that, but some places, that's not a sign that anything is wrong here. It's a sign that it's an area surrounded right in the middle of the Idaho Panhandle National Forest. Finally, I think the two final points would be that the statutory interpretation about WUI and adjacency really kind of comes down to is the WUI, the wildland-urban interface, excuse me, an area or a line. And it's, by statutory definition, it's an area. It has breadth. If you were to accept the holding that the project has to be right on the border of the at-risk community, that's treating only for areas that create a plan. The wildland-urban interface has no width. Surely it has at least as much width as if there were no plan. So if we agree with you, it doesn't have to be right next to it. But I also assume you're not taking the decision to be anywhere. It's as far away as you want it to be. No. That's the way as a community plan makes the boundary of the wildland-urban interface. It could extend the boundary of the wildland-urban interface 100 miles and you could locate the project at that outer edge. I'm not here to defend 100 miles. These units in this project area are, I would say, if you look at the map on page 88, no more than three miles from the three at-risk communities in this area. The question is, if you were to infer a substantive challenge which they chose not to bring, then we have the answer to that in the reply brief. All of these communities are within a validly designated wildland-urban interface and this court could affirm on that basis. Whatever the outer limit is, two to three miles is satisfied. Absolutely reasonable. Especially since as the supplement explains, these fires travel fast. There was a fire in this area that traveled 16 miles in nine hours. So there's nothing at all unreasonable about a project area three miles out where it's in declining health, already been found to be in declining health. Not just that there's bugs. There's bugs everywhere in the forest. But in declining health due to these infestations and diseases and where there's been this buildup of fuels and it's a very dense, much more dense than it should be. These forests are in kind of an unprecedentedly dangerous conditions. And that's what the Healthy Forest Restoration Act was enacted to help the Forest Service address. And this particular categorical exclusion was enacted for precisely this situation. Wildland-urban interface means the same thing in this categorical exclusion as it does anywhere else. It can't have a higher standard just because it means that NEPA doesn't apply. And to that point that we're exempting ourselves from NEPA. Is that definition elsewhere of wild-urban interface other than in the categorical exclusion? I mean, I guess. Oh, the term is used a number of places throughout the statute, yes. Yeah. The Forest Service is encouraged to carry out projects in it in a number of places. And it's used here. But it doesn't, what the district court held is that there must be something else when it means you're going to be exempt from NEPA. We have to ensure against the 100-mile barrier. And that was imposing a procedural requirement not found in the statute, which is contrary to this court's unanimous and bank decision in lands council, contrary to the Oregon National Natural Desert Association case. If something outrageous like that were ever to happen, all a plaintiff needs to do is say, this is 100 miles from the at-risk community. Raise a question. In the record, there was an opportunity for comment. They submitted 100 pages of comments. They certainly had the opportunity. They didn't choose to make this comment. And so the Forest Service is not, you know, didn't have the opportunity to create a record and address that. Okay. Thank you. If the court has no further questions, thank you. Thank you to both counsel for your arguments in the case today. The case is submitted.
judges: NELSON, FORREST, SUNG